# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## NOTICE OF ISSUANCE OF MANDATE

April 13, 2016

To:     Jon W. Sanfilippo
        UNITED STATES DISTRICT COURT
        Eastern District of Wisconsin
        Milwaukee , WI 53202-0000

| | |
|---|---|
| No. 15-1345 | UNITED STATES OF AMERICA,<br>Plaintiff - Appellee<br><br>v.<br><br>JASON B. GUIDRY, also known as Jay, also known as J,<br>Defendant - Appellant |

| **Originating Case Information:** |
|---|
| District Court No: 2:13-cr-00016-RTR-1<br>Eastern District of Wisconsin<br>District Judge Rudolph T. Randa |

Herewith is the mandate of this court in this appeal, along with the Bill of Costs, if any. A
certified copy of the opinion/order of the court and judgment, if any, and any direction as to
costs shall constitute the mandate.

PARTIAL RECORD RETURN            Record to be returned later

Exhibits to be returned later:                    1

This notice sent to:

[]        United States Marshal                [X]        United States Probation Officer

**NOTE TO COUNSEL:**
If any physical and large documentary exhibits have been filed in the above-entitled cause, they are to be withdrawn ten (10) days from the date of this notice. Exhibits not withdrawn during this period will be disposed of.

Please acknowledge receipt of these documents on the enclosed copy of this notice.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Received above mandate and record, if any, from the Clerk, U.S. Court of Appeals for the Seventh Circuit.

**Date:**                                          **Received by:**

_____                    _____

form name: **c7_Mandate**(form ID: **135**)

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

## In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 15-1345

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JASON B. GUIDRY,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 13-CR-16 — **Rudolph T. Randa**, *Judge.*

———————————

ARGUED FEBRUARY 17, 2016 — DECIDED MARCH 22, 2016

———————————

Before BAUER, FLAUM, and WILLIAMS, *Circuit Judges*.

FLAUM, *Circuit Judge*. Jason Guidry was sentenced to twenty-five years in prison after he pled guilty to possessing and distributing illegal drugs and prostituting women. On appeal, he challenges the district court's denial of his motions to suppress evidence found during searches of his car and his two residences; the imposition of two sentence enhancements; and the imposition of vague, ambiguous, and conflicting conditions of super-

vised release. For the reasons that follow, we vacate and remand the disputed conditions of supervised release, and affirm Guidry's conviction, prison term, and all other supervised release terms.

## I. Background

### A. Traffic Stop

On August 21, 2012, City of Sheboygan police officer Dustin Fickett stopped a car driving without license plates. When Fickett approached the car, he recognized Guidry, the driver. Fickett had pulled Guidry over a few months earlier and smelled a strong odor of marijuana, but after searching the car, Fickett did not find any illegal drugs. In the months that followed, Fickett learned that the Sheboygan Detective Bureau suspected that Guidry was using and dealing drugs.

During this stop, Fickett detected only a faint odor of marijuana, and because it was windy, Fickett was not sure that the odor was emanating from inside Guidry's car. As a result, Fickett did not believe that he had probable cause to search the car.

Fickett asked Guidry for his vehicle paperwork and identification and Guidry complied. Fickett returned to his car and immediately called officer Trisha Saeger, who handled a drug-detection canine, and asked her to come to the scene. While he waited for Saeger to arrive, Fickett processed Guidry's paperwork and called for a backup officer.

Saeger arrived about five minutes after Fickett's call, and officer Anthony Hamilton arrived about three

minutes after that. When Saeger arrived, Fickett was still preparing Guidry's citation.

After checking in with Fickett and Saeger, Hamilton approached Guidry's vehicle. Hamilton asked Guidry to exit the vehicle in preparation for a dog sniff, in accordance with standard department procedure. Guidry became argumentative, stated that he did not consent to a dog sniff, and remained in the car, fumbling with paperwork. Hamilton asked Guidry to show his hands and again requested that he step out of the car. This time, Guidry complied. Guidry did not close the door. Moments later, Saeger began the dog sniff.

Saeger has been working with Bud, her canine, since March 2009. Bud is trained to detect odors of marijuana, cocaine, heroin, and methamphetamine. Bud alerts to an odor change by changing his behavior. He is also trained to "indicate," usually by sitting, to an odor of drugs. As soon as Bud passed the driver's open door, Bud alerted. Soon after, Bud indicated an odor of drugs by sitting down in front of the door. Then Bud got up, approached the car, and, according to Guidry, put his head into the car through the open door.

Fickett told Guidry that Bud had indicated at the driver's door and Guidry admitted that he had smoked marijuana at home and still had a "half blunt" in the car. Saeger then searched the car and found the blunt, as well as a 7 UP "safe can" containing clear plastic baggies of heroin and cocaine. Fickett arrested Guidry.

### B.  Searches of Guidry's Residences

On August 22, 2012, the day after Guidry's arrest, Fickett and Detective Brian Bastil gave sworn testimony to a circuit court commissioner in support of a search warrant for Guidry's residence at 1725 North 12th Street (the "12th Street residence"). Fickett described the results of the search of Guidry's car: 15 grams of heroin, individually bagged; 4.1 grams of powder cocaine, individually bagged; and 3.9 grams of crack cocaine, individually bagged. Bastil testified that the car contained a distribution quantity of drugs worth thousands of dollars.

Bastil also provided information obtained from two confidential informants as part of an ongoing investigation of the 12th Street residence. The first informant, "CI-1," told Bastil that Guidry was prostituting women and selling large amounts of heroin, powder cocaine, crack cocaine, marijuana, and ecstasy from the 12th Street residence. CI-1 admitted to purchasing heroin from Guidry two months earlier. A second confidential informant, "CI-2," also disclosed that Guidry was selling heroin and other drugs from the 12th Street residence, and admitted to purchasing heroin from Guidry at the residence within the past two weeks. Bastil testified that Guidry identified 1725 North 12th Street as Guidry's residence on the night of Guidry's arrest, and that Guidry had admitted to smoking marijuana at his residence immediately before the traffic stop.

The court commissioner authorized the warrant and Bastil immediately led a search of the 12th Street residence. That search uncovered heroin, powder cocaine, a substantial amount of crack cocaine, a mason jar full of

marijuana, and another safe can. A woman present at the
residence during the search told Bastil that Guidry main-
tained another residence on Pine Street in which the ex-
change of sex and drugs took place. She said that Guidry
prostituted women there, that he took about ninety per-
cent of the money, and that he "feeds [the women] with
heroin."

A few hours later, Bastil again appeared before a
court commissioner seeking a warrant to search Guidry's
Pine Street residence. He described the drugs that were
found at the 12th Street residence, as well as the infor-
mation he learned from the woman who was present
during the search. Bastil also testified that named indi-
vidual Chelsee W. and another known female had visited
Guidry's Pine Street residence within the previous three
weeks and had received heroin from Guidry in exchange
for sex acts. Chelsee had told Bastil that the second fe-
male had overdosed at the residence after receiving her
heroin, a fact that Bastil independently confirmed. The
court commissioner authorized the search warrant.

### C. Motions to Suppress

On June 10, 2013, Guidry filed a motion to suppress
evidence found in his car during the traffic stop. He ar-
gued that because the driver's door was open, the police
had improperly expanded the dog sniff to the interior of
his car. A magistrate judge filed a report on July 1, 2013
recommending that the district court deny Guidry's mo-
tion because the officers' decision to leave the door open
was insufficient to show a desire to facilitate the dog
sniff. The magistrate judge also determined that the offic-
ers were acting under a reasonable suspicion that the ve-

hicle contained narcotics because Fickett detected a faint odor of marijuana during the traffic stop, Fickett had previously pulled Guidry over and detected a strong odor of marijuana, and Fickett had since received information that Guidry was using and dealing drugs. Guidry objected to the report and recommendation, but the district court adopted it on August 16, 2013.

On November 22, 2013, Guidry filed a supplemental brief in support of his motion to suppress, arguing that the searches of his two residences were unlawful because the information used to obtain search warrants was acquired through the illegal search of his car. He contended that the traffic stop was impermissibly delayed and broadened by Fickett's decision to bring a drug detection dog to the scene. The magistrate judge again recommended that the district court deny Guidry's motion, reasoning that the dog sniff did not delay the stop in any appreciable way because the canine officer arrived shortly after the stop was initiated. The district court adopted the magistrate judge's report, over Guidry's objection, on January 24, 2014.

On February 28, 2014, Guidry filed a motion to suppress the evidence discovered at his residences, again contesting the search warrants. He argued that the affidavits attached to the search warrants did not contain sufficient reliable information to establish probable cause. The magistrate judge filed a report on March 24, 2014 rejecting Guidry's claims and the district court adopted the report, over Guidry's objection, on July 10, 2014.

### D. Plea Agreement

Guidry entered into a plea agreement with the government on October 10, 2014. Guidry agreed to plead guilty to Counts 6, 7, 10, and 14: three counts of interstate travel for the purposes of prostitution in violation of 18 U.S.C. § 2421, and one count of possession with intent to distribute heroin, crack, and cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). Guidry preserved his right to appeal the decisions denying his motions to suppress.

The plea agreement contained an attachment with sworn testimony from three witnesses—A.R., M.M., and A.M.—supporting the three interstate travel counts. A.R. prostituted for Guidry from February to April of 2012. In her affidavit, A.R. explained that she believed Guidry loved her and that she was his girlfriend. To elicit her participation in his escort business, Guidry told her that men would pay thousands of dollars to spend time with "nice females like her." He posted an ad for her online and drove her to a hotel in Rockford where she "did dates." She explained that she was afraid of Guidry: "[H]e's a big guy … and anything could happen—I was afraid that it would get physical."

M.M. stated in her affidavit that she met Guidry in April 2012 through her boyfriend who purchased heroin from him. M.M. had been addicted to heroin but had been clean for six months before meeting Guidry. She was a stripper and Guidry said that she could make more money prostituting for him. Guidry took her to Rockford to prostitute and gave her heroin in return. Guidry knew M.M. was addicted to heroin and would go through

withdrawal if she did not get heroin every twenty-four hours. She explained, "[Guidry] scared me. I always wanted to please him … and I did not want to go through withdrawal."

A.M. also met Guidry in April 2012 when she and a friend started going to Guidry's house to buy heroin and crack. Guidry asked A.M. to prostitute for him and said it would be easy money. When A.M. told him she did not want to go to Rockford to prostitute, he threatened to cut off her heroin supply, so A.M. went to Rockford. She explained that she was afraid of Guidry because he had brutally beaten his ex-girlfriend, who was one of her friends, and because he was "very big" and "always yelling at us."

### E.  Presentence Report and Sentencing

The probation office prepared a presentence investigation report ("PSR") on December 23, 2014. The PSR recommended several sentencing enhancements, including a cross reference from U.S.S.G. § 2G1.1(a) to § 2A3.1(a)(2) because Guidry caused his victims to engage in sexual acts by placing them in fear, and a two-level "vulnerable victim" enhancement under § 3A1.1(b)(1).[1] Guidry's final guidelines range was 210 to 262 months.

At Guidry's sentencing hearing, the government offered the testimony of Dr. Selahattin Kurter, a doctor certified in psychiatry and addiction medicine. He testified about heroin's addictive properties and explained that

---

[1] For all three interstate travel counts, the PSR also applied a four-level enhancement under § 2G1.1(b)(1) because Guidry used fraud or coercion in committing the offenses.

addicts have a powerful fear of withdrawal that causes them to "look for the drug at all costs."

Detective Tamara Remington, the case agent for the trafficking portion of the investigation, testified about her contact with the witnesses. She explained that A.R. "has been very frightened since hearing [Guidry's] name again…. I believe she's gone into hiding. She's very scared." Remington explained that Guidry has a controlling and angry side that he used to keep A.R. prostituting for him. For example, A.R. had a violent confrontation with Guidry in 2012 when she tried to leave him. A.R. called a cab and as she entered, Guidry forcibly pulled her out. The cab driver was so concerned by Guidry's behavior that he intervened by holding on to A.R. and calling 911. A few days later, when A.R. returned to Sheboygan after staying with her parents, her apartment had been ransacked. Allegedly, Guidry told her that he was responsible and that A.R. was going to leave this world just as she entered it—with nothing. Remington also interviewed the cab driver that intervened to help A.R., and he confirmed A.R.'s account and explained that he recalled the incident well because Guidry was threatening both A.R., who he described as "petite," and him.

Before sentencing Guidry, the district court explained that after thoroughly considering the record, the court believed that the circumstances warranted an above-guidelines sentence. The court sentenced Guidry to 299 months, or nearly twenty-five years, in prison. The district court also imposed three-year terms of supervised release for each of the four counts, all running concurrently. This appeal followed.

## II. Discussion

On appeal, Guidry challenges the district court's denial of his motions to suppress evidence found during the searches of his car and his two residences; the imposition of two sentence enhancements; and the imposition of vague, ambiguous, and conflicting conditions of supervised release. We address each of these arguments in turn.

### A. Search of Guidry's Car

Guidry contends that the district court erred by denying his first motion to suppress because the evidence discovered during the traffic stop was the product of an illegal dog sniff. Guidry does not dispute that the traffic stop was lawful and supported by probable cause. He instead argues that the officers improperly prolonged the duration of the traffic stop and violated his Fourth Amendment rights by allowing the dog to search the interior of his car. When reviewing a district court's decision on a motion to suppress, we review findings of fact for clear error and conclusions of law de novo. *United States v. Uribe*, 709 F.3d 646, 649 (7th Cir. 2013).

### i. Duration of the Traffic Stop

In arguing that the officers impermissibly delayed the traffic stop to conduct a dog sniff, Guidry relies on *Rodriguez v. United States*, in which the U.S. Supreme Court held that police cannot prolong a traffic stop in order to conduct a dog sniff without reasonable suspicion that the vehicle contains illegal drugs. 135 S. Ct. 1609, 1615–16 (2015).

Under *Rodriguez*, Guidry's claim fails for two reasons: first, the dog sniff did not prolong the traffic stop, and second, even if it had, the officers had reasonable suspicion to believe that Guidry's car contained illegal drugs. First, unlike the search in *Rodriguez*, the dog sniff did not prolong the traffic stop in any meaningful way: Saeger arrived on the scene five minutes after Fickett called her, and at that time, Fickett was still preparing Guidry's traffic citation. As the magistrate judge observed, "most important here, at the time when Bud 'indicated' that drugs were present in the vehicle, thereby providing a new justification to extend the traffic stop, Officer Fickett had yet to complete his initial mission—that is, issuing Guidry a traffic citation."

Even if there was evidence that the officers had improperly delayed issuing Guidry's citation, this case satisfies *Rodriguez* for a second reason. In *Rodriguez*, the Supreme Court noted that reasonable suspicion of criminal activity would justify the police in detaining the driver beyond completion of the traffic infraction. *Id.* at 1616. Here, when Fickett pulled Guidry over, he had reasonable suspicion to believe that Guidry had drugs in his car. Fickett not only smelled a faint odor of marijuana, but he also recalled that he had previously stopped Guidry and smelled marijuana. Moreover, Fickett was aware that his detective bureau had evidence that Guidry was a drug user and dealer. Thus, Fickett "had reasonable suspicion of criminal activity at that point and so was justified in prolonging the stop for a reasonable time to confirm or dispel, with the dog's assistance, his mounting suspicions." *United States v. Sanford*, 806 F.3d 954, 959 (7th Cir. 2015) (holding that reasonable suspicion justified the of-

ficer in prolonging the stop by eight minutes to wait for the arrival of the drug dog).

### ii. Dog Sniff of the Interior of Guidry's Car

In arguing that the police officers violated his constitutional rights by allowing Bud to intrude into the interior of his car, Guidry relies on *United States v. Winningham*, in which the Tenth Circuit held that a dog sniff violated the Fourth Amendment. 140 F.3d 1328 (10th Cir. 1998). In that case, police officers stopped a van on the reasonable suspicion that it contained illegal aliens. Despite the fact that the van was empty, the agents called in a dog. The handler observed a "just noticeable difference" in the dog's conduct as it reached the rear of the van and unleashed the dog. *Id.* at 1329. When the dog reached one of the van doors that the officers had left open, it leaped into the van and methodically sniffed the interior. Eventually, the dog alerted at a rear vent that contained fifty kilograms of marijuana.

The Tenth Circuit determined that the officers' conduct, which included opening the door, allowing the van to sit for several minutes with the door open, unleashing the dog as it neared the open door, and allowing the dog to remain in the van, suggested a desire to facilitate a dog sniff of the van's interior. *Id.* at 1331. And because the police did not have reasonable suspicion for a search of the interior after their visual inspection revealed nothing suspicious, the Tenth Circuit held that the search violated the Fourth Amendment. *Id.*

This case is distinguishable from *Winningham*. Here, there is no indication that the officers intended to facili-

tate the dog's entry into the car. Unlike the officers in *Winningham*, Saeger kept Bud on his leash and did not allow him to jump into the car. Moreover, the officers did not open the door—it was Guidry who left it open. Immediately after Guidry exited, Saeger led Bud through her usual circuit, and despite her efforts to keep Bud outside of the car, his head allegedly entered it. In sum, the facts of this case are very different from those in *Winningham* and more closely resemble cases where no Fourth Amendment violation was found. *See United States v. Pierce*, 622 F.3d 209, 214–15 (3d Cir. 2010) (concluding that no Fourth Amendment violation occurred when a dog jumped instinctively though an open car door "without facilitation by its handler"); *United States v. Lyons*, 486 F.3d 367, 373–74 (8th Cir. 2007) (finding no Fourth Amendment violation when a dog stuck his head instinctively though a van's open window without being directed to do so by officers); *United States v. Stone*, 866 F.2d 359, 363–64 (10th Cir. 1989) (finding no Fourth Amendment violation when a dog jumped instinctively into defendant's open hatchback and when officers did not ask the defendant to open the hatchback for purposes of the dog sniff).

As important, at the point that Bud's head supposedly entered Guidry's car, the officers had probable cause to search the interior because Bud indicated that the car contained drugs while sniffing the car's perimeter. By contrast, at the time that the dog entered the van in *Winningham*, the officers had no reason to suspect that evidence of criminal activity would be found. 140 F.3d at 1331.

Because the dog sniff search of Guidry's car was lawful, the district court correctly denied Guidry's motion to suppress.

## B. Searches of Guidry's Residences

Guidry next attacks the legality of the search warrants for his two residences on the grounds that the officers did not have probable cause. "Probable cause is established when, considering the totality of the circumstances, there is sufficient evidence to cause a reasonably prudent person to believe that a search will uncover evidence of a crime." *United States v. Harris*, 464 F.3d 733, 738 (7th Cir. 2006) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). When a search is authorized by a warrant, deference is owed to the issuing judge's conclusion that there is probable cause if there is "substantial evidence in the record" that supports his decision. *United States v. Sims*, 551 F.3d 640, 644 (7th Cir. 2008) (citation and internal quotation marks omitted). We have also explained:

> Where probable cause is based on information supplied by an informant, we employ a totality-of-the-circumstances inquiry encompassing several factors: first, the degree to which the informant acquired knowledge of the events through firsthand observation; second, the detail and specificity of the information provided by the informant; third, the interval between the date of the events and a police officer's application for the search warrant; and fourth, the extent to which law enforcement corroborated the informant's statements. No one factor is determinative and a deficiency in one factor

> may be compensated for by a strong showing
> in another or by some other indication of relia-
> bility.

*United States v. Searcy*, 664 F.3d 1119, 1122 (7th Cir. 2011)
(citations and internal quotation marks omitted).

Guidry first contends that Bastil did not have proba-
ble cause to search his 12th Street residence because Bas-
til failed to corroborate statements made by the confiden-
tial informants, the informants did not testify in front of
the court commissioner, and some of the informants' in-
formation was old. These arguments assume that the
court commissioner relied only on the information pro-
vided by the confidential informants when issuing the
warrant. However, in addition to that information, the
court commissioner considered that officers had found
distribution quantities of drugs in Guidry's car and that
Guidry admitted to using drugs at his home. That evi-
dence alone provided probable cause to believe that a
search of Guidry's home would turn up further evidence
of criminal activity.

Guidry's arguments about the reliability of the in-
formants' information also fail. Although neither inform-
ant satisfied all four of the *Searcy* factors, there were
many indications that the information they provided was
reliable: the informants were known to police, they ac-
quired their information through first-hand observation,
their accounts were detailed, and CI-2 purchased drugs
from Guidry less than two weeks before his arrest. Alt-
hough CI-1's information was somewhat stale, CI-2's up-
to-date account corroborated it and gave officers cause to
believe that criminal activity was continuing at that resi-

dence. Further, the seizure of distribution quantities of drugs from Guidry's car corroborated the statements made by both informants. Therefore, the court commissioner correctly determined that there was probable cause to search Guidry's 12th Street residence.

Guidry next argues that the police did not have probable cause to search his residence on Pine Street because there was no indication that the informant present during the search of the 12th Street residence was reliable. But that informant also passed the *Searcy* test—her statement was detailed, based on recent information, and corroborated by other witnesses and the large amounts of drugs recovered from Guidry's home and car. As such, the court commissioner properly determined that the police had probable cause to search Guidry's Pine Street residence.

Because both warrants were legal, the district court did not err in denying Guidry's motion to suppress the evidence found during the searches of his residences.

**C. Sentence Enhancements**

Guidry disputes the district court's application of certain sentence enhancements. We review the district court's application of the sentencing guidelines de novo and its factual findings for clear error. *United States v. Bennett*, 461 F.3d 910, 912 (7th Cir. 2006).

*i. Cross Reference to U.S.S.G. § 2A3.1(a)(2)*

The applicable sentencing guideline for an interstate travel offense is § 2G1.1, but the district court applied the cross reference to § 2A3.1(a)(2), the criminal sexual abuse statute, because it determined that Guidry's offenses in-

volved conduct described in 18 U.S.C. § 2242—"caus[ing] another person to engage in a sexual act by threatening or placing that other person in fear …." Guidry acknowledges that the victims testified that they were afraid for their safety, but argues that this evidence is inadequate to permit the cross reference.

We disagree. "In the § 2242 context we define the concept of 'fear' broadly …." *United States v. Henzel*, 668 F.3d 972, 977 (7th Cir. 2012). In *Henzel*, we observed that the district court had underestimated the sentencing range by not applying the cross reference to § 2A3.1 when the evidence clearly showed that the victim, a twelve-year-old girl, was manipulated into having sex with the adult defendant, whom she feared. *Id.* We noted that the child testified and the defendant admitted that the child was afraid of the defendant, and that the defendant had "mental and emotional power" over her. *Id.* We also explained that the evidence suggested "that the girl feared … [that the defendant] would react badly if she did not meet his demands." *Id.*

As in *Henzel*, the evidence shows that Guidry exercised mental and emotional power over his victims, in addition to physical violence, in order to induce them to work as escorts. Each of the three victims testified that they were afraid of Guidry and what would happen to them if they did not do what he said. Moreover, each victim was addicted to heroin and Guidry controlled their supply based on their willingness to engage in sexual

No. 15-1345

acts. As such, the district court correctly applied the cross reference to § 2A3.1 when sentencing Guidry.[2]

### ii. "Vulnerable Victim" Enhancement

The district court also applied a sentence enhancement under U.S.S.G. § 3A1.1(b)(1), which allows courts to increase a sentence by two levels "if the defendant knew or should have known that a victim of the offense was a vulnerable victim." The guideline application notes explain that "vulnerable victim" means a person "who is a victim of the offense of conviction and … who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1 cmt. n.2.

The district court determined that the enhancement was appropriate due to Guidry's knowledge and exploitation of M.M.'s heroin addiction. Guidry opposes the

---

[2] Guidry also contends that the district court did not comply with Federal Rule of Criminal Procedure 32(i)(3)(B), which directs district courts to rule on disputed matters in the PSR before sentencing defendants, when it applied the cross reference. Guidry admits that this rule imposes only a "minimal burden" on the sentencing judge to make findings on record when resolving a dispute between the parties. *United States v. Heckel*, 570 F.3d 791, 796 (7th Cir. 2009). Here, the district court did make the necessary factual findings before sentencing Guidry. Although the district court did not separate the analysis for the cross reference and the § 2G1.1(b)(1) "fraud and coercion" enhancement, the district court noted Guidry's intimidating presence, his emotional and physical manipulation of the victims, and the victims' reasonable fear of him. Those factual findings supported the imposition of the cross reference and satisfied the minimal burden set forth under Rule 32(i)(3)(B).

enhancement, arguing that a victim's status as a drug addict is insufficient to warrant the enhancement, and that there was no evidence that M.M. was otherwise vulnerable.

Our sister circuits have held that drug addiction is not enough, standing alone, to serve as the basis for this enhancement. *See, e.g.*, *United States v. Volkman*, 736 F.3d 1013, 1030 (6th Cir. 2013) (holding that if the victims' drug addiction was the "sole basis for the district court's decision to apply the enhancement, then reversal would be warranted"), *vacated on other grounds*, *Volkman v. United States*, 135 S. Ct. 13 (2014); *United States v. Pavao*, 948 F.2d 74, 78 (1st Cir. 1991) ("[W]e should hesitate to say that anyone involved with drugs becomes *ipso facto* a 'vulnerable victim' of a crime …."). But federal courts have affirmed the vulnerable victim enhancement in cases involving drug addicts where the sentencing court "considered [the victim] as an individual, and … did not rest its ultimate determination simply upon the fact that [the victim] belonged to a class of … drug users." *Pavao*, 948 F.2d at 78; *see also United States v. Amedeo*, 370 F.3d 1305, 1317 n.10 (11th Cir. 2004) (affirming the sentence enhancement based on the victim's drug addiction and explaining, "[w]e do not suggest that every drug addict is a vulnerable victim within the meaning of § 3A1.1. Applying this enhancement is highly fact-specific and must take into account the totality of the circumstances" (internal citation omitted)).

In applying the sentence enhancement, the district court observed that Guidry used his knowledge that M.M. was addicted to heroin and suffered painful with-

drawal symptoms if she did not receive it to control her. In other words, the court applied the enhancement not simply because M.M. was an addict, but because Guidry preyed on her addiction in order to force her to engage in sexual acts. Because the district court appropriately considered M.M.'s individual situation, the court correctly applied the sentence enhancement.

**D. Conditions of Supervised Release**

The district court imposed thirteen standard conditions of supervised release and three "additional" conditions. Guidry objects to five of these conditions. Guidry did not raise his objections in his briefing before the district court or at his sentencing hearing and so we review for plain error. *United States v. Baker*, 755 F.3d 515, 523 (7th Cir. 2014).

*i. Standard Condition 4: Support of Dependents*

Standard Condition 4 requires Guidry to "use his best efforts to support his dependents." Guidry points out that because he was sentenced to approximately twenty-five years in prison, his three dependents (children who were sixteen, twelve, and ten years old at the time of his sentencing) will be adults when he is released. Because he is unlikely to gain any dependents while incarcerated, Guidry argues that the condition is not tailored to him individually. We found a similar condition requiring a defendant to "support dependents and meet family responsibilities" to be impermissibly vague and overbroad in *United States v. Sewell*, 780 F.3d 839, 851 (7th Cir. 2015). Moreover, Guidry is correct that the condition is not appropriately tailored to his personal history. Thus, we va-

cate the condition and remand to the district court for clarification.

### ii. Standard Condition 7 and Additional Condition 2: Use of Alcohol

Standard Condition 7 prohibits Guidry from drinking "alcoholic beverages to intoxication." This condition conflicts with Additional Condition 2, which requires Guidry to "refrain from use of all alcoholic beverages throughout his supervised release term." This inconsistency is an error that the court must address on remand. *See Baker*, 755 F.3d at 529 ("[C]onditions of supervised release must make clear what conduct is prohibited ….").

### iii. Standard Condition 13: Notification of Risks

Standard Condition 13 requires Guidry to "notify third parties of risks that may be occasioned by [his] criminal record or personal history or characteristics and shall permit the probation officer to make such notification and confirm [his] compliance with such notification requirement." In *United States v. Kappes*, we held that this condition contains "numerous ambiguities":

> There is no indication of what is meant by "personal history" and "characteristics" or what "risks" must be disclosed to which "third parties." Presumably, the meaning of these terms would change from defendant to defendant, which makes definitions particularly important with this condition.

782 F.3d 828, 849 (7th Cir. 2015) (internal citation and quotation marks omitted). Those same ambiguities are

No. 15-1345

present in this case, and as such, we vacate and remand this condition for clarification from the district court.

*iv. Additional Conditions 1 and 2: Payment for Treatment*

Additional Condition 1 requires Guidry to participate in a sex offender treatment program and "pay the cost of the program under the guidance and supervision of his supervising probation officer." Additional Condition 2 requires Guidry to pay for alcohol and drug abuse treatment. In *Baker*, we vacated similarly-worded conditions because they did "not specify what will happen if [the defendant] bears the burden of paying and is unable to do so." 755 F.3d at 529. For the same reason, we vacate and remand these conditions.

As a final note, we reiterate a point that we underscored during oral argument: It is important that in every sentencing, both the prosecution and defense confirm that any conditions of supervised release are unambiguous and sufficiently tailored to the defendant's circumstances, and remind the sentencing judge to make the appropriate findings justifying their imposition.

### III. Conclusion

For the foregoing reasons, we VACATE Standard Conditions 4, 7, and 13, as well as Additional Conditions 1 and 2; and REMAND for resentencing consistent with this opinion. We AFFIRM Guidry's conviction, prison term, and all other conditions of supervised release.

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

**CERTIFIED COPY**
A True Copy
Teste:

_____
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

**FINAL JUDGMENT**

March 22, 2016

Before:

WILLIAM J. BAUER, Circuit Judge

JOEL M. FLAUM, Circuit Judge

ANN CLAIRE WILLIAMS, Circuit Judge

| | |
|---|---|
| No. 15-1345 | UNITED STATES OF AMERICA,<br>Plaintiff - Appellee<br><br>v.<br><br>JASON B. GUIDRY, also known as Jay, also known as J,<br>Defendant - Appellant |

| **Originating Case Information:** |
|---|
| District Court No: 2:13-cr-00016-RTR-1<br>Eastern District of Wisconsin<br>District Judge Rudolph T. Randa |

The Standard Conditions 4, 7, and 13, as well as Additional Conditions 1 and 2 are VACATED and the case is REMANDED for resentencing consistent with the opinion. Guidry's conviction, prison term, and all other conditions of supervised release are AFFIRMED.

The above is in accordance with the decision of this court entered on this date.